J-S14011-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE M. DE LEON GONZALEZ | : | No. 932 WDA 2022 |

Appeal from the Suppression Order Entered June 30, 2022
In the Court of Common Pleas of Somerset County
Criminal Division at No(s): CP-56-CR-0000087-2021

BEFORE: PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY PANELLA, P.J.: **FILED: AUGUST 7, 2023**

The Commonwealth of Pennsylvania appeals from the Somerset County Court of Common Pleas' order granting Jose De Leon Gonzalez's motion to suppress evidence obtained pursuant to a warrantless search of the truck he was driving following a traffic stop. After careful review, we affirm on the basis of the well-reasoned opinion of the trial court.

The Commonwealth filed a criminal complaint charging Gonzalez with intent to deliver and possession of a controlled substance after 770 bricks of heroin/fentanyl were found in the vehicle he was driving during a traffic stop. Gonzalez filed an omnibus pretrial motion seeking to suppress evidence recovered from the warrantless search.

_____

[*] Retired Senior Judge assigned to the Superior Court.

On June 28, 2022, the trial court held a suppression hearing. The court heard testimony from Pennsylvania State Trooper Glenn Adams who conducted the traffic stop. Following the hearing, the court granted the suppression motion.[1] The Commonwealth filed a notice of appeal, certifying that the court's suppression order would substantially handicap the prosecution of its case pursuant to Pa.R.A.P. 311(d). The Commonwealth also complied with the trial court's directive to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

In response, the trial court filed a Pa.R.A.P. 1925(a) opinion. In its opinion, the trial court summarized the relevant facts leading to the court's decision to grant the suppression motion as follows:

> On January 5, 2021, at approximately 8:00 p.m., Pennsylvania State Trooper Glenn Adams conducted a traffic stop of [Gonzalez] for traveling in the passing lane on I-76 west, in violation of the Pennsylvania Vehicle Code. Trooper Adams eventually conducted a search of Gonzalez's van which revealed 770 bricks of heroin/fentanyl. The majority of the interactions between Trooper Adams and Gonzalez during the stop were captured on a motor vehicle recording ("MVR") from either a dashboard or passenger window camera viewpoint.
>
> …
>
> Once Gonzalez pulled off to the shoulder of the interstate, Trooper Adams approached the van and asked Gonzalez for his identification, registration, and proof of insurance. Gonzalez handed an identification card from the Dominican Republic to Trooper Adams, while the insurance and registration was under a third person. Trooper Adams then asked [Gonzalez] to "[p]lease

---

[1] The trial court entered the order on June 28, 2022. However, the order was not docketed as filed until June 30, 2022.

come on with me and bring your jacket. I'm going to get you a warning, OK? We will just conduct this stop [at] my vehicle. It's safer for me, OK? I'll tell you why I stopped you. Come on back."

Gonzalez exited the van, Trooper Adams patted him down and told Gonzalez "You can stay by my passenger side window, OK?" Once Trooper Adams entered his patrol car, he began to ask Gonzalez questions. Gonzalez was standing outside of the patrol car, looking inside through the passenger window. Trooper Adams testified, "it was slightly raining. It was cold."

Trooper Adams asked a series of questions while he simultaneously investigated the validity of the identification and registration by using his computer. Trooper Adams asked "[i]s that [van] yours? ... What's his name? ... Where are you coming from?" Gonzalez answered these questions in English, but usually after stating "ah?" as to prompt Trooper Adams to repeat his question. It is not clear whether the noise of the interstate, a language barrier, or a combination of both, caused this response from Gonzalez. Trooper Adams then asked "Where are you going? ... A donde? ... Where do you live? … Donde vive?" The Spanish version of the questions appeared to assist Gonzalez's comprehension because he answered quicker. Gonzalez answered "I have the address right now... Me? ... Reading, [Pennsylvania]."

A few minutes later Trooper Adams asked "How long are you going to be in, hmm, in Pittsburgh ... how long?" Gonzalez, with a confused look on his face, did not respond. Trooper Adams rephrased, "Cuanto tiempo en Pittsburgh?" Again, the Spanish version of the question got a quick response from Gonzalez, "Me? ... I'm going to pick [up] and come back."

Trying to figure out the van owner's full name and as his questions got more intricate, Trooper Adams began to use his cell phone as an English to Spanish translator. Trooper Adams asked through his cell phone translator "How long have you known him?" The cell phone articulated Trooper Adams' questions in Spanish. As Gonzalez began to formulate his response in English, Trooper Adams asked him to speak "en Espanol" to the phone, so it would be translated back into English. Each time questions were translated into Spanish for Gonzalez, he answered without hesitation. Trooper Adams used his cell phone as a translation service for approximately three minutes before reverting back to English. When asked at the suppression hearing about the

translation service, Trooper Adams explained that he "felt like we both understood what each other were saying more when we were speaking in English" and that the cell phone translation "muddied the waters a little bit."

After reminding Gonzalez that he was only giving him a warning, Trooper Adams asked if there was anything illegal in the van, to which Gonzalez responded "I'm sorry?" Trooper Adams clarified by asking if there were any "drogas", Spanish for drugs, in the van. Gonzalez responded "No, nothing. You can check it." Acknowledging at the suppression hearing that there was a "small language barrier", Trooper Adams attempted to obtain written consent. Trooper Adams handed Gonzalez a Spanish consent to search form because "I wanted Mr. De Leon Gonzalez to know clearly what I was asking and what his options were" and Trooper Adams "presume[d] that [Spanish] is his first language [and] that he would be better able to understand." Trooper Adams did not identify what the form was when he handed the form over to Gonzalez. When asked at the suppression hearing why he did not identify the form to Gonzalez, Trooper Adams stated "I think I was a little bit thrown off when he said -- when he started saying: 'You can check it.' And maybe I -- it slipped my mind."

A translator named Mr. Alejanro Pinzon read the Spanish consent form into the record at the suppression hearing. Part of the Spanish consent form translated into English stated "[a]rticles that will be looked for or confiscated, if found" to which Trooper Adams handwrote in the words "All contents any contraband" in English. The form also stated "I understand I have the right to refuse or deny this petition ... police may not be able to do this search without authorization." While handing the Spanish consent form to Gonzalez, Trooper Adams stated "You review it and then sign it after your read it". After Trooper Adams watched Gonzalez's "eyes track across the paper", Gonzalez responded "OK", and handed it back. Gonzalez did not sign the Spanish consent form prior to handing it back. Trooper Adams replied "I'm going to have you sign it in a second, OK?"

Between the time of requesting Gonzalez's signature and receiving it, Trooper Adams was communicating with his back-up through his computer, waiting for the back-up to arrive to safely conduct the search, and finishing documents related to the traffic stop. When Trooper Adams handed the Spanish consent form back to Gonzalez, he testified that he stated "[w]ith everything on the

form in mind, if you consent, can you sign the prescribed lines?", however, the statement according to the MVR was "[w]ith all that in mind, can you sign top and print in bottom, please". After this statement, Gonzalez complied and signed the form.

It is not clear when, if at all, Gonzalez was given back his identification, registration, and insurance documents. In addition, the MVR was played at the suppression hearing but only until Gonzalez signed the Spanish consent form and nothing further. Gonzalez completed his signature at approximately the 21:25 minute mark of the MVR.

Trial Court Opinion, 10/14/22, at 1-5 (citations omitted). The trial court explained that it granted Gonzalez's motion to suppress because it found the Commonwealth was unable to meet its burden with respect to proving the validity of the roadside consent. *See id*. at 11; *see also* Suppression Order, 6/30/22. Further, the court put its reasons for suppression on the record as follows:

Consent still remains a dangerous area. And when you have a big fish on the line or if you think you have a big fish on the line, you better know that you have your consent locked up.

Now, let's walk through the steps of what happened here.

The stop was good. The stop was good. I can see with my own eyes that the defendant was driving in the left lane for some period of time. Nothing drives me more crazy than being in a left lane on the Turnpike and then have somebody going 55 with the right lane open. The stop was good.

I think that the continued discussion with the defendant along the roadside developing information that was supported by reasonable suspicion was good. It was fine.

But what the Trooper developed along the road that evening was the reasonable suspicion to have a dog called to the scene, who would have alerted for sure, and then probable cause would have

been secured by a search warrant or a search warrant would have been issued as a result of the issue of the probable cause.

The Commonwealth has the burden of establishing that the consent was knowing, voluntary, freely given, and I don't believe in this instance, this instance, handing the document to the defendant and saying " Sign here" was good enough.

Now, I'm going to change the facts a little bit. Had Trooper Adams said: This is a consent form. If you sign it, it will give me the right to search your vehicle and all of its contents. You understand that you are not obligated to sign this.

Those extra words would have secured the consent, but there's too much left to doubt in terms of the Commonwealth's burden here for the Court to find that this consent meets the legal standard required of our constitution.

I say out loud that I have no objection to aggressive drug interdiction along our highways. If nothing else, an awful lot of drugs were taken off the street that night and they don't have to be returned. But if you want to go the next step and secure prosecutions and convictions, you have to be more careful.

N.T., 6/28/22, at 65-67.

On appeal, the Commonwealth argues the suppression court erred in concluding Gonzalez's consent was not knowing, intelligent and voluntary.

When this Court reviews a Commonwealth appeal from an order granting suppression, as we are tasked to do here, we may only consider the evidence produced at the suppression hearing and then, only that evidence which comes from the defendant's witnesses, along with the Commonwealth's evidence which remains uncontradicted. *Commonwealth v. Barr*, 266 A.3d 25, 29 (Pa. 2021). We must determine, in the first instance, whether the suppression court's factual findings are supported by the record and if they

are, we are bound to those findings. *See id.* We must always keep in mind that the suppression court, as fact-finder, has the exclusive ability to pass on the credibility of witnesses. *See Commonwealth v. Fudge*, 213 A.3d 321, 326 (Pa. Super. 2019). Therefore, we will not disturb a suppression court's credibility determinations absent a clear and manifest error. *See id.* at 326-327.

We must also determine whether the legal conclusions the suppression court drew from its factual findings are correct. *See Barr,* 266 A.3d at 39. Unlike the deference we give to the suppression court's factual findings, we have *de novo* review over the suppression court's legal conclusions. *See Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010).

> It is well-settled that a search conducted without a warrant is unreasonable and unconstitutional unless an established exception to the warrant requirement applies. One such exception is consent[.]
>
> To establish a valid consensual search, the Commonwealth must first prove that the consent was given during a legal police interaction. Next, the Commonwealth must prove the consent was given voluntarily. To be considered valid, the consent must be the product of an essentially free and unrestrained choice — not the result of duress or coercion, express or implied, or a will overbourne — under the totality of the circumstances.

*Commonwealth v. Carmenates*, 266 A.3d 1117, 1124 (Pa. Super. 2021) (*en banc*) (citations and internal quotation marks omitted). Here, the legality of the police interaction is not disputed. Accordingly, we direct our analysis to the second part of the test only - whether the consent was valid.

To determine whether a consent is valid when provided close in time to a traffic stop, courts consider the following factors:

> 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, ... thus suggesting to a citizen that his movements may remain subject to police restraint,"; 9) the "presence of an express admonition to the effect that the citizen-subject is free to depart is a potent, objective factor;" and 10) whether the citizen has been informed that he is not required to consent to the search.

*Id*. (citation omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court we conclude the Commonwealth is due no relief. Following our review of the totality of the circumstances, we can find no error in the trial court's analysis and conclusion that Gonzalez's consent was not knowing, intelligent, and voluntary. The trial court opinion properly addresses the suppression claim, and we adopt it as our own. *See* Trial Court Opinion, 10/14/22, at 6-7 (thoroughly addressing the 10 factors for assessing consent, and finding that factors 2, 3, 7, 8, 9, and 10 weighed against a finding that Gonzalez consented to the search); *see also id*. at 7-11 (thoroughly addressing the similarities between this case and *Carmenates*, and highlighting that: neither Gonzalez nor Trooper Adams used the word "search;" Trooper Adams did not ask Gonzalez if he could read

or understand the Spanish language consent form; Trooper Adams did not explain what the Spanish language consent form was when he handed it to Gonzalez, and Trooper Adams did not offer a reason for this failure; Trooper Adams never informed Gonzalez that he could refuse to sign the Spanish language consent form, and in fact directed Gonzalez to sign it.). Accordingly, the trial court properly suppressed the evidence seized pursuant to the search.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/7/2023